JOHN D. YOUNG, Complainant and Appellee, v.
REBECCA J. YOUNG, Defendant and Appellant.
—349 S. W. (2d) 545.

Western Section.  May 26, 1961.

Certiorari Denied by Supreme Court September 6, 1961.

646

Hanover, Hanover, Hanover & Walsh, Memphis, for appellant.

Montedonico, Boone, Gilliland, Heiskell & Loch, Shepherd, Heiskell, Williams, Beal & Wall, Memphis, for appellee.

AVERY, P. J. (W.S.). This cause comes to this Court from the Chancery Court of Shelby County, Tennessee, Division II, Honorable Ceylon Frazer, Chancellor.

In this opinion the complainant, John D. Young, will be referred to by the title of his status in the lower Court, "complainant" or by his name followed by the abbreviated designation "Jr." because his father's name was the same as his, and the name of the father will be mentioned in the opinion as it is in the case because the cause involves title to land which his father had possession of until his death, and Rebecca J. Young will be referred to by that name or her status in the lower court, "defendant", or by the designation of "step-mother of complainant".

The action is essentially one in ejectment and the question involved is whether or not the involved real estate is owned by complainant, and he is entitled to possession of it, or that it is owned by the defendant and she is entitled to possession of it. It was at the beginning of this suit in the possession of the defendant.

The tract of land involved contains 48.84 acres, and is described by dimensions in the original bill, but without minutely describing it in the opinion it is referred to as a tract of land located near Raleigh, Tennessee, in Shelby County.

It seems proper to specifically set out the events which is alleged by the pleadings and shown by the proof to have caused this litigation necessary:

1—John D. Young, the father of the complainant, was first married to Olivia B. Young, mother of complainant.

2—The title to the tract of land involved was vested in Olivia B. Young, she being the sole and surviving heir of her mother, Elander Bentley and father, J. W. Bentley, to whom said land had been conveyed for life, with remainder to the heirs of said Elander Bentley. The deed of conveyance is of record in Book 111, page 466, Register's Office of Shelby County.

3—Olivia B. Young, after her marriage to John D. Young, and before any child was born to her, did on February 20, 1908, make a will whereby she left all of her estate to her husband, John D. Young.

4—On May 22, 1916, complainant was born to his said mother, and she died in September 1918, he being her only surviving child and heir at law, and also survived by her husband, John D. Young, referred to in the record as "John D. Young, Sr".

5—Said will was admitted to probate in common form in the Probate Court of Shelby County on September 24, 1918, and appears of record in Will Book 30, page 190.

6—Olivia B. Young and husband, John D. Young, executed several trust deeds securing debts mentioned therein by conveyance of said property to trustees, prior to her death, the last appearing to be executed in April 1918, and the debt secured thereby outstanding at the time of the death of Olivia B. Young.

7—John D. Young, the executor, without bond and as provided by the terms of the will of his said wife, administered her estate, and filed his settlement as such with the Clerk of the Probate Court of Shelby County on May 18, 1921, and in that report of his settlement there is contained the following statement:

"Your Executor respectfully shows that no claims have been presented against the estate — and he knows of no debts that are unpaid—That he has paid the funeral bill and all personal charges against the deceased. That he is the sole legatee under the will of the deceased—and is also entitled as husband of deceased to any and all personal assets that was or might have been owned by her.

"He, therefore, prays that this may be taken as his final settlement & that he be discharged as executor.

"As your executor is the sole devisee he is advised that no notice is necessary."

And to which statement he made the oath required of such executor. That settlement was reported to the Court and approved by the Court with the proper order entered on the minutes.

8—John D. Young, after the death of complainant's mother, was married the second time, and that wife only lived about a year. Thereafter on June 23, 1923, he was married to the defendant, Rebecca Young. At that time John D. Young was 44 years of age and the defendant was 25 years of age, and at which time the complainant was seven years of age. He lived with his father and said stepmother and there was born to his father and stepmother a daughter, Maude Young, all of whom lived together at 1968 Nelson Avenue in the City of Memphis, for a considerable time.

9—On September 12, 1946, John D. Young and his wife, the defendant, Rebecca Young, executed a deed to United States of America conveying a permanent easement through said tract of land for the erection of an electric

power line thereon, with the usual covenants and warranties of title.

10—On the 9th day of June 1951, John D. Young and the defendant, Rebecca J. Young, jointly executed a deed in which it is recited ''that for the considerations hereinafter expressed'', they conveyed to Maude Clifton Johnson, a widow, and who is the mother of Rebecca J. Young, said tract of land, and in which the consideration expressed is ''10.00 and other good and valuable consideration''. This deed was recorded on July 2, 1951, in the Register's Office of Shelby County.

11—On the same day, June 9, 1951, Maude Clifton Johnson, a widow, executed a deed by which she conveyed ''for the consideration hereinafter expressed'' the said tract of land to John D. Young and wife, Rebecca J. Young, and the consideration therein expressed is ''10.00 and other good and valuable consideration'', and which deed was recorded in the Register's Office on July 2, 1951, and which purported to convey the estate by the entireties in the said John D. Young and his wife, Rebecca J. Young.

12—Complainant's father died April 7, 1954, and prior thereto he had executed a will witnessed by J. N. Gray and L. L. Green, and in that will there was a bequest to complainant in the following words: ''To my beloved son, John David Young, the farm'', but which will was never found after the death of complainant's father, nor was its destruction proven.

13—Prior to the death of complainant's father, on January 1, 1953, he wrote a letter to his son on the stationery of Ideal Heating Company, which company was operated by the father and complainant's step-

mother, said to be partners therein; sealed the letter in an envelope, writing on the outside of the envelope: "Dr. John D. Young, do not open this until I have passed on." Which letter is written with ink and in long hand and is as follows:

"Jan. 1, 1953

"Dr. John D. Young,

Dear Son:

The following instructions if followed, will clear the title to your farm. There is a title guarantee policy in the safe by Commerce Title Co. Guaranteeing the title to your mother, your mother left a will willing the farm to me writen either in 1910 or 1911. This will was never changed in way after you were born, nor any provision made in this will for future airs, so at her death the will was of no value as long as you lived. I had the will probated to protect me if anything hapened to you, her people could not set up a claim for the land. Rebecca found where the will had been probated and prepaired a deed deading the place to me you can go into Probate court and have the will set aside, then the title will be in your name. I hope you can get this cleared up without other people knowing that this leter was ever writen.

"Lovingly your Dad,

John D. Young"

"G. B. Bentley refered to in this survey was your great grand father, on your mothers side, he only had one air a daughter. She married Jerimyer Anderson and her firs name was Jennie—they had one

boy who was killed in an axident in 1901—and one girl, Olivia B. Anderson Young, your mother.

"John D. Young"

14—Complainant's father had control and possession of the land until his death.

15—John D. Young, complainant, made some inquiry of his stepmother, the defendant, relative to his father's estate in which he informed her that he only wanted the farm that belonged to his mother, and at that time was informed by defendant that he had no farm, whereupon he thereafter opened the letter which his father had written him, and thereafter on December 19, 1958, filed his original bill in this cause.

16—It is obvious from what is related hereinbefore that there is involved in this litigation the question of T.C.A. sec. 32-303, being our Pretermitted Child Statute as relates to wills; the question of adverse possession under our seven year adverse possession statute, the question of title by prescription resulting from adverse possession over a period of twenty years, and whether the will of complainant's mother is sufficient to disinherit her afterborn son.

This bill sets out the essential facts necessary and which avers that in accord with our Pretermitted Child Statute that on the death of his mother the complainant becomes seized with a fee-simple title to said land subject to a life estate, of his father; that the deeds executed by his father and defendant to defendant's mother, and by the mother back to the father and defendant, his wife, undertaking to create an estate by the entireties, are ineffective, and that on the death of the father,

any estate attempted to be created in defendant by the deeds terminated. This original bill prays:

1—For process.

2—Title and right to possession to said land be decreed to complainant and he be put in possession thereof.

3—That he had a decree for all rents and profits of the land while in the defendant's possession, and for the taking and stating of an account therefor.

4—That the deeds from John D. Young to Maude Clifton Johnson and from Maude Clifton Johnson to John D. Young and defendant be declared void, a cloud on complainant's title, and that defendant be perpetually enjoined from setting up any claim of title to said property, and

5—For general relief.

Answer was filed in due season by which the material allegations of the bill are denied, her right to possession is averred and (1) that complainant had no title to said land and by the answer the (2) seven-year statute, adverse possession under recorded deed, and twenty years adverse possession by prescription pleaded, and (3) laches.

By it defendant denies that she has withheld unlawfully said property; she admits using it since the death of her husband, avers that it is hers in fee and claims title to said land by the referred to deeds; avers estoppel on the part of complainant and it is a rather lengthy answer consisting of 16 typewritten pages which sets up a narrative of averments of activities on the part of the involved parties, which she claims supports her contentions.

On April 1, 1960, by a proper order, answer was amended by which defendant averred that complainant became 21 years of age on 22nd day of May 1937, and it pleads statute of limitations set forth in T.C.A. sec. 28-107, which is the three year statute of limitation, T.C.A. sec. 28-206, which is the possession statute against persons under disability, and Section 28-209 which is the presumption of ownership statute after payment of taxes for twenty years.

The original answer and the amendment thereto pleads every defense known to the law in an effort to retain possession of said property by the defendant and to seek an adjudication of title thereto in her.

On the trial of the cause the learned Chancellor, on his own motion, called for a jury and at the conclusion of the testimony he submitted to this jury four issues of fact for their determination, and it is well enough at this period in this opinion to set forth the issues submitted to the jury by the Chancellor, together with their answers, and to follow that with the necessary quotations from the written memorandum opinion filed by the Chancellor, upon which findings he arrived at his conclusions and final decree in favor of the complainant, to which the defendant saved exceptions, prayed, was granted and has perfected her appeal to this Court. The issues framed by the Chancellor and submitted to the jury with their answers, are as follows:

"I.

"Did Olivia B. Young disinherit the complainant?

"Answer 'yes' or 'no': No.

## "II.

"Did John D. Young, father of the complainant, renounce the life estate which he would hold under the pretermitted child statute?

"Answer 'yes' or 'no': Yes

"If your answer to Issue Number II is 'no', it is not necessary that you answer the Issues numbered III and IV. If your answer to Issue Number II is 'yes', then you will answer the Issues numbered III and IV.

## "III.

"Has the defendant together with her husband, John D. Young, with full knowledge of the complainant, had exclusive, actual, continuous, open and notorious possession of the lands in dispute adverse to any and all claims of the complainant in and to said lands for a period of seven years since the father of the complainant renounced his life estate under the Pretermitted Child Statute?

"Answer 'yes' or 'no': No.

## "IV.

"Has the defendant together with her husband, John D. Young, with full knowledge of the complainant, had exclusive, actual, continuous, open and notorious possession of the lands in dispute adverse to any and all claims of the complainant in and to said lands for a period to twenty years since the father of the complainant renounced his life estate under the Pretermitted Child Statute?

"Answer 'yes' or 'no': No."

The finding of the Chancellor with respect to each issue is fully explained, being succinctly shown from the following quotations from his memorandum opinion:

"The Court, on its own motion, had placed the case on the jury calendar. The defendant, Rebecca J. Young, is an attorney and solicitor and an officer of this Court and, in cases where an attorney is a litigant and sharp issues of fact may arise, this Court has considered this course consistent with having all litigants leave the courtroom feeling that they have had their day in Court and eliminating any feeling, no matter how ill-founded, that the Court has favored an attorney and solicitor or has leaned over backwards in attempting to avoid any appearance of favoring an attorney and solicitor.

\*　\*　\*　\*　\*　\*

"In cases where the Court, on its own motion, has submitted issues to a jury, Gibson's Suits in Chancery, (5th Ed.) Volume 1, Section 596, page 648, states:

" 'The Chancellor is in a sense bound to accept and act upon the verdict of a jury to whom he has of his own motion submitted some matters of fact. The opinion of the jurors is still, however, wholly advisory.

" 'He may reject it entirely or he may adopt it in toto; or he may abide the conclusion of the jury as to some points and disregard it as to others and find the facts for himself. It is for the Chancellor to determine to what extent he will make use of the verdict in forming his decree.'

"The above quotation from Gibson is considered to express the law of this State.

"Accordingly in such cases, the responsibility of determining the material issues of a cause remains with the Court.

\*  \*  \*  \*  \*  \*

"With respect to the answer of Issue No. 1, the Court adopts the finding of the Jury on that Issue as the finding of the Court.

\*  \*  \*  \*  \*  \*

"The Court cannot approve the findings of the jury on Issue No. II, for the Court considers that a necessary essential of renunciation by a life tenant, as alleged in this cause, is that any attempted renunciation, to be effective to start the running of the statutes of limitation, must be accompanied by such positive overt act or acts or express notice as to clearly convey to the remainderman that the life tenant is holding the property in dispute not as life tenant but under a claim of ownership incompatible with the existence of a life tenancy and the existence of a remainder interest.

"In the opinion of the Court, there is no substantive evidence in this cause upon which any such overt act or acts or express notice, as are requisite, may be established by the preponderance of the evidence. Indeed, the converse is considered to be true, the preponderance of the evidence being that the proof is lacking to establish any such overt act or acts or express notice."

He then explains why, based upon the charge he gave the jury, that it is his opinion that the jury associated the running of the statute of limitations not with Issue No. II, but as Issues Nos. III and IV, and said:

"It is quite apparent that had the Court not submitted Issue No. II or had Issue No. II been separately combined into the Issues numbered III *and* IV, the verdict of the jury on the questions of adverse possession would have been adverse to the defendant. The jury, after hearing all the proof on adverse possession definitely determined that the defendant should not prevail on these defenses.

\*   \*   \*   \*   \*   \*

"The Court does approve the verdict of the jury on Issues numbered III and IV.

"The Court considers that the widest possible latitude was given the defendant to establish its affirmative defenses and, after a full and fair trial, the defenses could not be established."

The learned Chancellor then sets forth his reasons why he concludes that this case is principally governed by the decision of the Supreme Court in the case of Edwards v. Puckett, 196 Tenn. 560, 268 S. W. (2d) 582, and that he has considered his charge to the jury with respect to the issues controlled by that opinion as in conformity therewith. He then gives consideration to the principal Tennessee case relied upon by the defendants, which is Ensley v. Ensley, 105 Tenn. 107, 58 S. W. 288, and refers to the fact that in that case there was a widow and two children who were beneficiaries under the will and two pretermitted children, and in that case the

Supreme Court apparently did not apply the complete and full meaning of the Pretermitted Child Statute, and then he quotes from that opinion as follows:

" 'A very difficult question is the basis upon which these children's shares shall be estimated. The statute says they shall take the same share as if the father had died intestate. The literal application of this provision would require that the widow's dower, homestead, and year's support should first be excluded from computation of the aggregate estate, and an equal share in the remainder be given to the pretermitted children. But the widow has not taken dower and homestead, or other interest under the law, but on the contrary, has taken under the provisions of the will. If the dower, homestead, and year's support are excluded from the estimate, it is said it can be only on the theory that they go to the widow. But it is evident a widow can not be compelled to take dower and homestead, or either of them, but may elect to take under the will, as she has done in this case; not only so, but she may renounce and disclaim all right to dower, homestead, or other interest that the law gives her as widow in the estate, which are to be paid primarily out of the estate, and leave the whole of it for division, and, in the opinion of the majority of the Court, this is what has been done in this case, and the two pretermitted children are entitled to take as if there had been no will, and the widow had renounced her right to dower, homestead, and year's support in the estate —that is, each takes one-fifth of the entire net estate.' 105 Tenn. 106 [107] (131-32, [58 S. W. 288.])

"It may be, and probably because of undisclosed complexities involved, the above shown computation of the shares of the Ensley pretermitted children in the net estate (that is, a one-fifth, instead of a one-fourth, interest in the real estate) is not readily understandable, but the above underlined language is completely clear and precise and expresses that law which must be applied in this case."

It may be that the learned Chancellor's reference to the meaning of the Supreme Court in the use of its language above quoted from the Ensley opinion is correct, that is, that the full application of the Pretermitted Child Statute was not applied. The writer of this opinion is rather of the view that the Supreme Court, even with the rather hard to reconcile verbiage with the law in the Ensley case, made its conclusion of the division of the property between the four children, two of which had been pretermitted, and the widow, taking into consideration the rights of the widow who was then living in all of the property of which her husband had died seized and possessed, in giving the widow an interest in the involved property equivalent to the interest of each child, was, in the mind of the learned Justices of that Court, making a complete application of the meaning of the Pretermitted Child Statute, insofar as values of what the living widow and each child would take had no will been executed.

The memorandum opinion of the learned Chancellor was announced in his consideration of the motion for new trial which had been filed by the defendant. He then states his reasons for overruling each contention set forth in the motion for new trial, and he refers in his very fine memorandum opinion to the claimed expendi-

tures and the alleged abandonment or waiver of claim to the land by complainant. He also refers to the fact that in accord with the proof in this case the defendant was charged with knowledge of the existence of the will of the former wife of her husband, mother of complainant, and the law applicable to a pretermitted child and makes reference to the deeds executed in an effort to create an estate by the entirety and the conclusions which may be drawn from defendant's participation in such action by saying:

"It was, and is, the conclusion of the Court that by the very language of the deeds by which the defendant asserts ownership of the land in dispute, she, at the very least, is charged with knowledge of the contents and date of the will of the mother of the complainant and, of course, on the basis of that knowledge, and her intimate association with the complainant in his infancy, knew or was charged with knowing, that the complainant was a pretermitted child."

This Court thinks that is a rather mild statement by the learned Chancellor and that the very fact that these deeds were executed, the one to defendant's mother signed by herself, as well as her husband, and then taking one back from the mother on the same day and for the same recited consideration, though in some instances might have created an estate by the entirety, under the facts of the instant case, she then knowing that her husband had executed a will devising this property to his son, which she says she looked for and could not find after his death, creates a clear inference that the defendant had come to the conclusion that she could not stake her title upon the action of the father of this child,—her

husband, in dealing with the will of his first wife, the mother of the complainant, in the manner now contended for by her to give her title to the property involved. The facts of the case will be further referred to in this opinion.

Based upon the learned Chancellor's memorandum, his decree was entered sustaining the contention of the complainant, setting aside the deed executed to the mother of the defendant by herself and her husband; the deed executed by the mother to the defendant and her husband and decreeing a fee simple title to have existed in the involved property from the death of complainant's mother, subject alone to the life estate of his father,— by curtesy, as if complainant's mother had never executed a will.

His decree provides for a reference to the Master to take proof and report upon certain items of expense alleged to have been incurred, and the payment of taxes which defendant claims she had paid, and the value of rents and profits which she may have collected since the death of her husband, and granted defendant a discretionary appeal.

The Assignments of Error are nine in number and essentially are as follows:

Assignment No. 1 is levelled at the action of the Chancellor in holding that the complainant was not disinherited by the will of his mother.

Assignment of Error No. II is levelled at the action of the Court in holding that "John D. Young, Sr." did not elect to take under the will and did not renounce his right of curtesy by operation of law.

Assignment of Error No. III is levelled at the action of the Court in holding that neither the statutes of limitation or adverse possession of seven years or twenty years apply.

Assignment of Error No. IV is levelled at the action of the Court in refusing to hold that the defendant was a purchaser for value in good faith and without notice of any title of ownership claimed by complainant, and in refusing to submit that issue to the jury.

Assignment of Error No. V is levelled at the action of the Court in holding that the complainant did not abandon or waive any claim to the land in question and which brought about acts, expenditures of money and obligations on the part of the defendant to her prejudice, and in failing to submit such an issue to the jury.

Assignment of Error VI is levelled at the action of the Court in failing to hold at the conclusion of all the proof that John D. Young had elected "to take by devise under the will of Olivia B. Young, and not by operation of law", and that as a matter of law this resulted in John D. Young and John D. Young, Jr., becoming at that time tenants in common, each owning a one-half interest in fee in the land described.

Assignment of Error VII is levelled at the action of the Court in refusing to grant defendant's special instruction, Request No. I, as follows:

"The Court charges you that if the apparent life tenant acquires some color of title incompatible with the existence of the life estate and remainder estate even though by void act or instrument, deed, or will, and takes and holds possession thereunder, and not as

a life tenant, and remainderman knows of such entry, holding, and possession, and the nature thereof, a cause of action then accrues to the remainderman, and if he takes no steps then, or within the statutory period, he must suffer the consequences.''

Assignment of Error No. VIII is levelled at the action of the Court in refusing to give in charge to the jury defendant's Special Request No. II as follows:

''The Court charges you that if John D. Young, Sr. had elected to take under the will of Olivia B. Young, and not by operation of law, then at that time a one-half interest in the fee vested in him, with the remaining one-half interest being vested in John D. Young, Jr., under the pretermitted child statute of the State of Tennessee.''

Assignment of Error No. IX is levelled at the action of the Court in holding that no proof was competent to show that Maude Arnold and her husband, Ben Arnold, had built a summer house on the land involved.

It seems to us that the Assignments of Error and brief in this case covering 76 pages present arguments that are wholly without merit. The reply brief, which covers 62 typewritten pages, likewise has much that needs no consideration by this Court, but perhaps it was in an effort to reply to the unnecessary, and what we consider the inapplicable arguments made by defendant's brief. Neither brief discusses each Assignment of Error separately, but counsel for defendant, appellant in this Court, has stated that the questions involved are seven in number which we will here quote, answer following each question the way we interpret the applicable law

and proof, and then, after having answered all the questions, will discuss our reasons therefor.

"1: Did Olivia B. Young disinherit her son, John D. Young, Jr.?

Our answer is No.

"2: Did John D. Young, Sr. elect to take under the will of Olivia B. Young, and renounce his right to take by operation of law?"

That is a double question and must be answered in either aspect in the negative.

"3: If he did so elect, and renounce, what was the effect thereof?"

Having concluded that he did not so elect and did not so renounce, as a matter of law or fact, we find no necessity to make any further reply to such an inquiry.

"4: Did John D. Young, Sr. acquire any title by adverse possession?"

We conclude both legally and factually that he did not.

"5: Was Rebecca Young an innocent purchaser for value on June 9, 1951?"

We concluded that she was not.

"6: If John D. Young, Sr. did so elect, renounce, and hold adversely, did the deed of John D. Young, Sr. to Rebecca Young and John D. Young, Sr. by the entirety, constitute color of title for more than seven years prior to the filing of the cause of action?"

Having held that we must answer Question No. 2 above set out in the negative, then this Question No. 6 under

the applicable law and facts must be answered in the negative.

"7: John D. Young, Sr. having elected to take under the will and renounce his right to take by operation of law, what effect did the Pretermitted child statute and the case of Ensley vs. Ensley have upon the facts of this case?"

Our discussion of the answers to Questions 1, 2, and 4 will reflect our opinion in connection with Question No. 7.

We will discuss our answers to Questions No. 1, No. 2, No. 4 and No. 5 together.

The will in question is as follows:

*"Last Will and Testament of Mrs. Olivia B. Young, Deceased Filed September 24, 1918*

"State of Tennessee
Shelby County.

"I, Mrs. Olivia B. Young, being of sound mind and disposing memory and realizing the uncertainty of life and the certainty of death, do make and publish this as my last will and testament hereby revoking and making void, all others by me at any time made.

"FIRST

"I direct that all my funeral expenses and all my just debts be paid as soon after my death as possible, out of any moneys, that I may die possessed of, or may first come into the hands of my executor.

"SECOND

"I give and bequeath to my beloved husband, John D. Young, all of my property, both real, personal and mixed, that I may die possessed of, with full power and authority to sell or otherwise dispose of the same, as he may see fit.

"THIRD

"I do hereby nominate and appoint my husband, John D. Young, the executor of this my last will and testament, and it is my desire that no bond be required of him nor do I desire that he be required to make any settlement or file any report.

"In witness whereof, I do to this my last will, set my hand this twentieth day of February 1908.

"Mrs. Olivia B. Young.

"Signed and published in our presence and we have subscribed our names hereto in the presence of the testator, and in the presence of each other. This twentieth day of February 1908.

"W. H. Cox
Chas. E. Hunt

"Admitted to Probate and ordered recorded September 24, 1918.

"Recorded September 24, 1918.

J. S. Galloway, Judge
"Jno. C. McLemore, Clerk."

"A pretermitted child is one who was in existence when the will was executed but is not mentioned.

\* \* \* \* \* \*

"The word 'pretermitted' is also used in Tennessee to refer to a child born after the making of the will but not mentioned or provided for in the will. A child born after the making of the will, either before or after the death of the testator, not provided for nor disinherited in the will, and not provided for by a settlement made by the testator in his lifetime, is entitled by statute to succeed to the same portion of the testator's estate as if he had died intestate. * * * However, where the will expressly or impliedly discloses an intention to exclude children from a share of the estate or where the intention to exclude the after-born child is established, these statutes do not apply." Phillips' Pritchard on Wills, Vol. 2, page 966, Section 966.

"In most states the common-law rule that the subsequent birth of a child did not affect the prior will of its parent has been altered or abrogated by statute. While these statutes vary greatly in their details, they may be considered to fall into two general classes: (1) Those which provide that the birth of a child revokes the will; and (2) those which provide that an after-born child (and, in many states, also a child omitted from the will, for whom no provision is made, without affirmative provision in the will showing an intention to omit him) shall take as though the testator had died intestate." Page on Wills Bowe-Parker Revision, Vol. 2, p. 527, Sec. 21-104.

The statute which we must consider, T.C.A. sec. 32-303, is as follows:

"Pretermitted child—Portion to which entitled.—A child born after the making of a will, either before or after the death of the testator, inclusive of a mother-testator, not provided for nor disinherited, but only pretermitted, in such will, and not provided for by settlement made by the testator in his lifetime, shall succeed to the same portion of the testator's estate as if he had died intestate." Code 1858. Sec. 2193 (deriv. Acts 1823, ch. 28, Sec. 1); Shan., Section 3925; mod. Code 1932, Sec. 8131.

Nothing has been added to the law as set forth in that section since its original enactment by Chapter 28, the Public Acts 1823, except by the Code of 1932, the words: "inclusive of a mother-testator" were added.

■ This statute raises a presumption, when the Courts are confronted with a will such as we have in this case, against any intent on the part of a testator to disinherit afterborn children. In Marshall v. Marshall, 1941, 25 Tenn. App. 309, 315, 156 S. W. (2d) 449, 450, 453, Judge Felts, then a member of this Court in the Middle Section, and now a Justice of the Supreme Court, had under consideration the meaning of our statutes with respect to pretermitted children, and he said:

"The statute raises a presumption against such an intent, but does not prescribe the quantum of evidence necessary to overcome such presumption, or how the intent to disinherit shall be evidenced. The decisions, however, have declared certain principles to aid in the construction of a will under this statute. *The testator's oral declarations as to his intent cannot be received.* (Emphasis added) Burns v. Allen, 93 Tenn. 149, 23 S. W. 111. But other extrinsic

evidence is admissible to aid in the construction of the will and to show that the pretermission or omission was intentional. Woerner, American Law of Administration, 3 Ed., 161; Reeves v. Hager, 101 Tenn. 712, 716, 50 S. W. 760, 761; Fleming, Adm'x v. Phoenix Trust Co., 162 Tenn. 511, 512, 39 S. W. (2d) 277; King v. King, 166 Tenn. 115, 59 S. W. (2d) 510. Disinheritance may be evidenced by express words, or by unavoidable inference, or necessary implication. King v. King, supra.''

■ There is nothing in the foregoing will; nothing shown by this record that remotely indicates that the mother, testatrix, ever did anything or performed any act which showed any intention to disinherit an after-born child. It is argued that the fact that she did not change her will after this, her only child was born, is an element for consideration, but such facts standing alone unsupported by any act indicating a contrary intent on the part of the mother, the will speaks for itself and brings it squarely within the meaning of our Pretermitted Child Statute. Nothing else appearing by which this child lost his inheritance from his mother in the property in question, he takes as though no will ever existed, which is simply to say that his father would have a life estate by curtesy and complainant took title to the property by remainder in fee simple.

It is insisted that under the doctrine which is attributed to the opinion of our Supreme Court in Ensley v. Ensley, supra, at least would create an estate in said property in the father and the predeceased child as equal tenants in common. We do not so understand the law, neither do we consider that said opinion of the

Supreme Court so holds. In that case, as stated hereinbefore, the will was executed by the father.

I have referred to the fact that at the time the Ensley will was executed his wife and two children were in existence. After the will was made and before his death one child, Enoch, was born, and after his death and within eight months another child, Mary, was born. It has been 61 years now since that will was in litigation, and in view of the importance attached to this will by the briefs and argument of counsel for the parties, and the conclusion given to it by the Supreme Court, as may be related to the facts of the instant case, it seems proper to here copy that Ensley will:

"I make this my last will and testament. I am of sound mind and body sufficient for the purpose.

"I want my property of all kinds to be divided between my wife, Mary L. Beecher Ensley, my son, Martin Ensley, and my daughter, Hattie Ensley, as follows:

"Should my wife give birth to a child in the next eight months, and the child should live, I will and devise to her (she to provide for the child) my residence, together with all furniture of every kind, carriage horses and carriages, etc., on the corner of Rayburn Avenue and Broadway, and after that one-third of all my other property of every kind.

"In the event the child should not live, say twelve months, then I give her my residence, etc., if she desires it, but she must take of my property her one-third, less the value of the residence, etc. The remainder of my property I give to my son and daughter equally, or, say, one-third of the whole each.

"I appoint my wife sole executrix to execute this will, and I give her power to sell and make title to any of my real estate, particularly my Mississippi river plantations. I, however, except a tract of land of 111 acres, more or less, adjoining the city of Birmingham. This land I don't want sold, but I want it divided equally in value into three parts to my wife, son and daughter—my son and daughter's part to go to them during their lives, and then to the heirs of their body, but my wife's part to go to her during her life, and should she have no child by me, then I want my two children or their children to take her part. Should either of my children die without heirs of their body living, I want the other child, or her or his children, my wife's child (if she has any by me) to take equally of this land, or say, one-third of this land so left.

"I have spoken of all my property to be divided in this will so far without making any outside bequests. I want to give my wife an executrix's power to give out of my estate, before division, as much as $15,000 of bequests to my kinfolks, say, to Melville Williams $5,000 or $10,000, in her discretion, and the balance to some one else, who may be needy, I give her full power to spend what money she may desire in improving burial grounds and the erection of suitable monuments, etc.

"I want no bond required of my executrix. I have all faith that she will do everything that is right by my son and daughter. I give her five years to wind up my estate, but in the meantime she must give to Martin and Hattie each $250 per month to live on.

I don't want bond required of my wife as executrix.

"Witness my hand and seal.

Enoch Ensley.

"J. M. Trezevant,
Napoleon Hill,
Witnesses."

It is insisted by counsel for defendant that disinheritance may be evidenced by unavoidable inference or a necessary implication as referred to in King v. King, 166 Tenn. 115, 59 S. W. (2d) 510; in Fleming Adm'x v. Phoenix Trust Co., 162 Tenn. 511, 512, 39 S. W. (2d) 277; and Reeves v. Hager, 101 Tenn. 712, 50 S. W. 760.

In Fleming, Adm'x v. Phoenix Trust Co., supra [162 Tenn. 511, 39 S. W. (2d) 278], an expression by the Kentucky Supreme Court in the case of Leonard v. Enochs, 92 Ky. 186, 17 S. W. 437, was approved in the following words:

"If it clearly appears from the will that the testator excluded all his children as a class, not merely the living ones or some of them, from the provisions of the will, such intention will exclude the after-born children."

As we understand the law, "unavoidable inference or necessary implications" must result from some facts relating to the acts of the testator, such as a multiplicity of relationships, the mother may have been at the time of the execution of the will carrying a child in the gestation period, or having living children in the home that she did not mention in her will, or an adopted child. No such existed in the case under consideration.

It seems to be the argument of counsel for the defendant that these unavoidable inferences or necessary implications may arise from the acts of the devisee or legatee, such as in this case would be only the father, but we are not inclined to the opinion that any act he did perform could possibly support a conclusion that consideration should be given to the intent of the mother of the complainant so as to bring into play this doctrine of unavoidable inference or the doctrine of necessary implication.

If we examine the acts of this father after this will was probated in an effort to find something which he has done that would indicate an intent on his part to deprive this complainant of an inheritance under the Pretermitted Child Statute from his mother, we run headon into this written statement of the father, in his own handwriting, sealed and delivered to his son which negatives any conclusion that he ever had an intention to deprive his son of this tract of land owned by his mother, and there can be no escape from the conclusion that if he did perform any act of ownership to the exclusion of his son's remainder interest in said property, it would have to be accorded to the ignorance of his father, and we are not prepared, under the circumstances, to conclude that the father has ignorantly committed any act to so sustain a title in him or in others by adverse possession which can defeat the intent expressed by his father in such written document. It may be reasoned that the deed executed by the father and the stepmother of defendant to her mother could not be said to be an act of ignorance on the part of the father. When the facts of this case are examined through the searchlight of equity, we can not help but conclude that the knowl-

edge of the legal member of this partnership, known as Ideal Heating Company, was being exerted because she realized that up to that moment nothing had been done by the father whereby the statute of limitation could be invoked and in realization of the difference in age, it could be reasonably anticipated that she would outlive her husband and that through this circuitous route by which an estate by the entireties was attempted to be created, was her only hope. We agree with the learned Chancellor, though he did not say so in express words, could be seen badges of clouded intent emanating from a legal mind which would preclude a court of equity from sustaining such attempted conveyances as sufficient to start the running of the statute of limitations against the right to possession of the property involved by the complainant, after the death of her husband, and such apparent intent greatly affects the weight to be given all the evidence involving the efforts to show an intent on the part of the father to perfect a legal title in himself or others whereby the only child of a deceased mother would be deprived of his remainder interest, in fee, in said property. Though the father was an uneducated plumber, his action in leaving the writing personally delivered to his son under the circumstances here involved, indicates that he was aware of efforts which did not originate with him.

Mrs. Elizabeth Cullen, a former teacher in the public schools of Memphis and a member of the same church as Mr. Young, Sr., was with him and a group from the church out to see the peaches at the farm in question in 1931. Her statement is:

"I asked him if he had ever thought of building a house for himself to go and rest on week ends and

he said no, that the farm belonged to his son and that his son would do whatever he wanted to with it.''

Mr. Henry Green knew Mr. Young, Sr., intimately for about 45 years; had offices with him (Mr. Young, Sr.) for several years. Green was an electrician and Young a steamfitter, offices together about three years. Was asked and answered:

''Q. Did he ever discuss with you this farm out there in Raleigh? A. The only thing I know about the farm was—my recollection was that he considered it to belong to his son.

''Q. That was Mr. Young, Sr., saying that it belonged to his son? A. Yes, sir.

''Q. Did you ever hear Mr. Young, Sr., make any statements as to whether or not he could sell the farm? A. I have heard him make several statements that he could not sell it. I know specifically because it was left to the boy, the son.''

He also testified that he had witnessed a will for Mr. Young, he and Mr. Gray. He does not remember the date and he was asked and answered:

''Q. And from that time on, of course, he always talked about it being his son's farm? A. Prior to **that also.**

''Q. Sir? A. Prior to that also.

''Q. **Prior to** that and after he prepared that paper? A. Yes, sir.

''Q. This paper, in other words, that he signed in your presence, and you signed in the presence of

him and Mr. Gray, and Mr. Gray signed in the presence of you and Mr. Young, he said that was a paper about the farm going to his son? A. Yes, sir.''

L. W. Reeves testified that he had lived in Shelby County 35 years; that he came to Shelby County in about 1925, and lived in the Egypt-Raleigh community. Knew John D. Young, Sr., since 1926, and rented the farm from him. He was asked and answered:

''Q. Tell us about the transaction or what took place? A. Well, he come to me and asked me to take the place and farm the place, and he said that the place was run down, and he wanted to build it up. He had an orchard out there, and he wanted to build it up, and he wanted to build the place up for his boy when he got to be 21 years old.''

The witness stated his first rental agreement was for five years and after that he rented the farm from year to year as long as Mr. Young lived. He further testified that Mrs. Young, the defendant, would come out to the farm with her husband, and he was asked and answered:

''Q. Did you ever hear Mrs. Young express herself with respect to the work that was going on out at the place? A. Yes, sir. She said it wasn't none of her business; and she didn't have anything to do with it.''

He further testified that after the five-year period of rental was up some real estate man came out and looked over it and asked him to tell Mr. Young that he would give $40,000 for the place, and he told Mr. Young about it. He was asked and answered:

"Q. Did he ever tell you why he gave you the money to hire the laborers? A. Yes, sir.

"Q. What did he tell you? A. He said, 'take this money and hire the laborers', because he didn't want his wife to know it, because she was opposed to him spending any money on the place out there, because it never prospered her anything. He said that with his own tongue."

He further testified that there were two lakes on the farm when he left and that he had a conversation with Mr. Young about the installation of the second lake. He was asked and answered:

"Q. What, if anything, did he say to you? A. He said he wanted to build it, because the boy wanted a lake, and he was in the service at that time, and he was building it to satisfy him.

"Q. Did Mr. Young ever state to you that the farm belonged to any other person other than his son? A. No, sir, no, sir. The second time I ever met that man, he said that the farm was going to the boy. He was building the place up for his son when he became 21 years old."

On cross-examination he was asked and answered:

"Q. Mr. Reeves, did he tell you he was going to give the boy a deed when he became 21? A. No, my friend, there wasn't anything said about a deed. I have told you here just as that man spoke it."

Harlan E. McCoy, a real estate dealer with residence in Shelby County, associated with Wallace E. Johnson, realtor, said he had associated with the Senior Young and saw him most every Sunday during his lifetime; that

he knew about the farm in question and estimated he had been out there at least five times to Sunday school parties and things of that kind. He was asked and answered:

"Q. Did Mr. Young, Sr., ever discuss with you the ownership of that farm? A. He did very briefly.

"Q. Can you recall about when that was? A. It was sometime when John D. Jr., was home on a furlough. He was in the Service and he had his uniform on that particular day, and I think John D. Young, Sr., and I had looked at the Church out there that we were building together and the basement was being dug out this day, and we were having a party out at the farm, and during that conversation I do recall that he said, 'The farm doesn't actually belong to me; it belongs to Jimmy'.

"Q. And by 'Jimmy' to whom are you referring? A. John D. Young, Jr."

Mrs. Norma Margaret Nelson lived in Memphis for 25 or 30 years, whose husband is an architect; knew John D. Young, Sr., having first met him 20 or 25 years before, she testified; that she and her husband and Mrs. Young, the defendant, and Mr. Young, Sr., were all good friends, visited the farm frequently, usually on Sunday afternoon; that these occurrences were before and during the second World War. She stated that she had a brief conversation with Mr. Young about buying a lot or leasing a lot and building a home out there on the farm and she was asked and answered:

"Q. What, if anything, did he say in reply to your inquiry? A. He said that that would be wonderful

and that he would love to have us out there, but that he couldn't sell it, and I said, 'Well, why?' he said, 'Well, I am just—it is mine during my lifetime; then it goes back to Jimmy'."

The trial Court first ruled that the complainant Dr. Young, could not testify with respect to conversations he claimed he had with his father, but he later held that these conversations were competent on the question of "either renunciation or lack of renunciation", and upon his holding to that effect he also let in conversations between defendant and the deceased, which will be hereinafter referred to.

The substance of Dr. Young's evidence is that the family lived in peace and harmony during his childhood, his educational career and that on many occasions as a young child and young man he went to the farm in question with his father beginning in the late twenties, and as they worked they talked about the farm and on "several occasions he told me that he had gotten this farm from my mother and that he had control and management of the farm during his lifetime, and I would not take control of the farm until after his death." He qualified the expression "several occasions" by saying that such conversations occurred on "numerous occasions". He was asked whether his father told him how he would get the farm and where it had come from and he answered:

"Only that it had been in my mother's family for a long time, and that my mother had gotten it from my great grandmother. It passed to the survivor of my family, from my great grandmother and had come to my mother."

Dr. Young stated how, where and when the letter which his father had addressed to him and requested that he open it only after his death, had been placed in his hands personally by his father, and that he had not opened it or looked at its contents until he had a conversation with the defendant shortly after his father's death. The original is exhibited with the record, dated January 1, 1953, and shown by Dr. Young to be in the handwriting of his father and copied in this opinion, beginning on page 651. In the envelope Dr. Young testified was the two "written documents" copied on pages 651 and 652 of this opinion, together with an original survey, and that the original survey had been misplaced. He gave a history of the survey which is not necessary to repeat.

Dr. Young testified that he had no knowledge from any source with respect to the probation of the will of his mother, nor the deeds by which an attempt was made to put title to the property in the defendant; that he had never been advised that such deeds had been executed; that he had no knowledge of the report made by his father as executor under the will of his mother and that the association with his father was practically continuous until after his marriage except the time that he was in service and after the marriage he visited his father frequently and they went to the farm many times thereafter. He said that neither his father, Mrs. Rebecca Young, the defendant, nor anyone else had advised him about the deeds by which defendant undertook to get title, until after his father's death, and that he was in constant touch with the family after those deeds were executed until the death of his father. He related, however, on one occasion in 1952 he had said something to his father relative to having some title papers with respect to the farm and

that his father remarked "we will talk about it later", but there was no indication ever made to him that his father in any way was claiming adversely to his interest. He further stated that the first time he had ever known that his mother had made a will was after his father's death when he was told by the defendant. He further testified that after the father's death he, in an effort to try to be of some service to the defendant, as his stepmother, in a conversation with her he said to her: "All I want is my farm", and she said, "you don't have a farm", and a few days thereafter the defendant came to his office with a memorandum reference to the farm and "to which she had attached a copy of my mother's will." He then made reference to his action with respect to inquiries about his rights in the farm and how they might be protected. His details of the moves made by the family and activities of the partnership are enlightening but further reference is not necessary to his original examination except to say that exhibits were introduced, some of which have been heretofore mentioned and will be hereinafter.

In rebuttal the complainant testified that he knew that his father at one time had a will, but that he never stated to him exactly what was in the will.

He further testified he did not know the combination to the safe in the place of business of his father and defendant and that he never could recall of having opened the safe but one time and that was while the business was conducted on Madison Avenue.

Mrs. Maude Young Arnold, witness for defendant and half-sister of complainant, testified that she was born on October 6, 1925; that she stayed with her grandmother

in the daytime and that her mother worked at the office of the Ideal Heating Company as far back as she could remember and ''she kept the books there, answered the telephone and the regular office work''.

On direct examination she was asked if she had heard any reference made to a will that Dr. Young's father had made. Her answer was, ''Yes, sir, many times''. She can not remember how long it had been since she heard it, but she thought it was prior to 1937, and said there was a reference made to the fact that he had willed the farm to Jimmy so that he would have something to fall back on or to borrow money on. She further stated that she had never heard her father say the farm belonged to anyone but him, and was asked if she heard the conversation between the complainant and his father. She said this conversation was with reference to a cabin that complainant wanted to build on the farm, and she was asked and answered:

''Q. Tell us what happened and when that was. A. Well, it was at the farm, and they were talking about what they wanted to put out there, and daddy told him he didn't want him to build it out there.

''Q. Did he say why? A. No, he never did say why.''

She said she heard some conversation about complainant wanting to borrow some money, and was asked and answered:

''Q. Tell us what occurred? A. There were several other members of his class that had borrowed money from some clubs in Memphis that lent money to professional men, and he wanted some money to

do some things that they were doing, and he asked for it, but they wouldn't let him borrow it, but they told him if the farm was willed to him at that time that he could borrow money on the farm, and that he could pay it back, but he said he didn't want it if he had to do it that way. When he inherited the farm he wanted it free and clear."

She stated she would help her mother out at the office on some occasions and had heard conversations between her father and mother with respect to money that the father had borrowed. She was asked and answered:

"Q. Did you ever—who started the conversation about the loans? A. Mother would usually ask him when he was going to pay or start paying on the money that he had borrowed from her."

She stated she had been present on occasions when her father borrowed money from her mother. She testified about how the loans would be consummated and was asked and answered as follows:

"Q. How did she give it to him, by check or cash? A. Cash.

"Q. Where did your mother get that money, if you know, that she would give him in cash? A. She got most of it from home. Some of it she took out of the bank.

"Q. Do you know which ones she took out of the bank, which loan it was? A. No, sir."

She also testified that she had seen her "daddy give her mother cash."

She was asked about the property on Harbert Street and who owned it. She answered, "It was daddy's originally, and he gave it to mother when they were married." She testified she was present at one time when her father gave her mother a note. She was asked and answered:

"Q. Your mother was more or less pressing him from time to time? A. Yes, sir, because he was always going to pay it back, but never did."

This witness detailed, with some leading suggestions from counsel, her version of the execution of the deeds by her father and mother to her grandmother and from her grandmother back to her father and mother as tenants by the entirety, and it was her explanation that the deeds were prepared one day and that she went down next day and brought the notary over to the home where they were acknowledged, and she remembered seeing some notes passed between her father and mother and in connection with this transaction she was asked and answered:

"Q. I will ask you, Mrs. Arnold, if you ever discussed with him, with your father after that, whether you discussed the farm with him with reference to Doctor Young? A. Yes, sir, I told him I thought he should tell him.

"Q. You did tell your father that he should tell Doctor Young about it? A. Yes, sir.

"Q. Why did you tell him that? A. Because 'Jimbo' would make references to the farm, that it would be his, and daddy had willed it to him, and I thought he should tell him about it, and I thought it would be only fair to tell him so that he wouldn't be so

disappointed. I told him that he should tell Jimmy that he had deeded it to mother.

"Q. Did you tell your father that? A. Yes, sir.

"Q. What did he tell you? A. To mind my own business.

"Q. Did you tell Jimmy that afterwards? A. No, sir.

"Q. You respected your father's wishes? A. Yes, sir."

She detailed a conversation which she said she had with the complainant in May or early June after her father had died in April, and this is what she said:

"A. It was, I would say, in May or early June, and he came to the house one day and showed me a letter that daddy had written to him and he asked me to read it, and I did, and he said that didn't I think that daddy had intended for him to have the farm from the letter, and I told him that I didn't think so because that wasn't what he did, and he said that under the circumstances he would offer mother something for the farm if he could talk her into signing it over to him. I told him that I wouldn't do it, and he said, 'I will give her something for it', and then he said that he would leave it to my discretion as to whether he repeated the rest of it—

\* \* \* \* \* \*

"Q. Was that the letter his father had written to him? A. That's right. Then he said that didn't I think daddy had intended for him to have the farm and I told him that it was a funny letter for him to

write, but that wasn't what he did. Then he said it was—he thought it was going to be his, and he wanted it, and I said, 'Daddy inherited it, and he inherited it with a heavy mortgage on it', and he said he had not heard anything about that. I told him that the mortgage had been paid off after daddy had inherited it, and he said if he could talk mother into signing it over to him that he would give her something for it, and he said that he would leave it to my discretion as to whether to tell mother, but he said that he didn't like her and he never had.''

And in connection with that conversation she was further asked and answered:

''Q. Mrs. Arnold, I will ask you if any mention was made of that conversation or any other conversation you had with him about any payment of any sum of money? A. No, he said, 'I will give her something for it'.

''Q. You say no sum of money was actually mentioned, any figure? A. No, sir.

''Q. Was the sum of $15,000.00 mentioned? A. No, sir.

''Q. I will ask you, did you convey that message to your mother? A. In its entirety.

\*    \*    \*    \*    \*    \*

''Q. And you made no mention of this to your mother, as to any payment of any amount of money; is that right? A. Yes, sir.''

This witness further stated that she had known something about money being kept in the safe by her father and that she had on several occasions seen him take a

drawer from the safe in which she referred to as the "contract drawer" that he kept money in there with the contracts, and in that connection she was asked and answered:

"Q. And you have seen him take money sometimes from those drawers in cash? A. Yes, sir, frequently."

She also stated that her daddy, her mother and "Red", her husband, knew the combination to that safe, but that she did not. She was asked who built the house on the farm after her father's death and she stated that she and her husband did, and was asked and answered:

"Q. Who paid for that house? A. We did, Red and I."

She stated that she got her mother's permission to build the house and that her mother had a right to use it and that it cost approximately $3,000. She was shown some invoices and was asked about whether they represented the expenditures in the house and that, together with the total cost of expense, was objected to by counsel for complainant and the objection sustained by the Court.

When this witness was taken over on cross-examination she was immediately asked about the conversation she claimed to have heard, as testified on direct examination, between complainant and his father about a cabin being built on the farm by complainant, and that she had heard her father say on other occasions that the farm belonged to him and she was asked this specific question:

"Q. * * * You did not mean to say that these statements were made to Dr. Young, did you? A. No, not necessarily.

"Q. As a matter of fact, you have no knowledge of such statements being made to Doctor Young, do you? A. Yes, I do.

"Q. Were you present on the occasion of this conversation? A. Yes, sir, one of them was."

At that point her attention was called to the fact that her deposition had been taken on July 8, 1959, in the office by counsel for the complainant, which was a discovery deposition, and the questions with her answers were read to her from that deposition as follows:

" 'Q. Do you know whether or not at any time in your presence your father made any statement to John Young, Jr., to the effect that he claimed the entire title to the property rather than a life interest? A. Ask me that again.

" 'The question was read, and you said: A. No.' "

Another question was read to her from that discovery deposition to the same effect, which was followed by a sort of leading explanation from Mr. Hanover, but her answer continued to be "No". Then the following question was read:

" 'Q. Do you know of any communication, verbal or written, between your father and John D. Young, Jr., which would tend to convey to John D. Young, Jr., your father's intentions to hold the title to the property in question and as totally his own and adversely to John D. Young, Jr.?

" 'And your response was: A. No.

" 'Q. Is that correct? A. Yes, sir, that's what I said.' "

Several of the questions in the discovery deposition were read to her with respect to this cabin building matter, one of which was:

" 'Q. But you remember no details whatever of the conversation?

" 'Your answer was: A. No.' "

She admitted that she had so answered. Her answers to questions read from that discovery deposition directly contradicted what she testified to at the hearing with respect to the cabin conversation and she undertook to explain the difference by saying: "I hadn't thought about it that day. That is the first time I had been questioned about that".

"Q. But you did give that answer? A. Yes, sir, but I hadn't thought about the incident in a long time."

The witness, Ben W. Arnold, husband of Maude Arnold, was offered as a witness for defendant; told about his marriage, how he went to work in the business with the elder Mr. Young and with respect to Mrs. Young's connection with the business he was asked and answered:

"Q. What was Mrs. Young's connection with the business? A. Mrs. Young ran the business most of the time and answered the telephone and did the bookkeeping, all that was to be done, and she was just running the business from the office standpoint."

He then testified that he had heard conversation between Mr. and Mrs. Young about money that Mrs. Young had loaned him and he was asked and answered:

"Q. Where was the money deposited? A. To the best of my knowledge, Mr. Young deposited the money in the bank.

"Q. What bank or what account if you know? A. The Manhattan Branch of the Union Planters Bank. That is the only deposits that I know of. It was in the company account.

"Q. In the Company account? A. Yes, sir."

He was asked about how the payrolls were made by the company and said on occasions there would be cash in excess of the payroll which would be put in the safe drawer and he was asked and answered:

"Q. And this excess payroll, did Mrs. Young know it was happening? A. I really couldn't answer whether she did or not, sir.

"Q. You don't know? A. No, sir."

He stated he had heard quite a few conversations between Mr. and Mrs. Young about money and loans. He was asked and answered:

"Q. Do you recall any of the times that she was making demand for payment of those debts from him? A. I remember occasions when she would ask him to repay the money that she had loaned him, but he would always put her off.

"Q. Did she continue to ask him? A. Well, she kept after him periodically."

He then stated that he knew about a conversation which occurred about the time these deeds were being drawn and the substance of his conversation was that

they had considerable money in the bank at that time and she was asking Mr. Young to make some payment of the money that he owed her; that Mrs. Young went to the bank and got the money for the payroll and when she came back these deeds were drawn and he was there when Mrs. Young wrote the deeds out on the typewriter at the direction of Mr. Young. He was asked and answered:

"Q. What was that discussion? A. Well, at first he wanted to give it to her in her name, and then she suggested that she suggested that they put in both their names."

He then stated he saw some notes given to Mr. Young and that Mr. Young put them in the safe, but he was not present the next day when the deeds were acknowledged.

He was asked what, if anything, he ever heard said between Dr. Young and his father about the farm, he answered:

"A. Well, I did hear at one time or another the farm mentioned, but as to what they were discussing about it, I couldn't tell you, sir."

He said that Dr. Young came by the office to see his father right frequently prior to his father's death.

On cross-examination and on inquiry with respect to the execution of these deeds, he was asked and answered:

"Q. You don't know what kind of deed it was? A. No, sir, I don't.

"Q. How many deeds did they write there in the office that afternoon, if you remember? A. One, as far as I remember.

"Q. That is all you remember, one deed? A. That is all I remember."

And with respect to the notes he said he was "not prepared to swear definitely how many notes there were." He was asked and answered:

"Q. Mr. Arnold, were you aware of the fact that these deeds were executed there on that Friday afternoon, and the next day, and that that was kept a secret from Doctor Young up until Mr. Young's death? A. No, sir, I wasn't aware of that fact. I did not know whether Doctor Young knew about it or not. I didn't know whether his father had told him about it or not.

"Q. Did you discuss with your wife as to whether she had told Doctor Young? A. No, if she had told him, she would have told me, I am sure, and I know that on a few occasions she tried to get her father to tell Doctor Young of this transaction. I was present once. But she wasn't successful.

"Q. But never succeeded in doing this? A. Never succeeded, no, sir."

Mrs. Rebecca Young testifies that she just grew up in the church with Mr. Young and she gives a history of his first and second marriage,—but more specifically the first, as known to her. Mr. Young was 20 years her senior and was engaged in the plumbing business when they married in 1923. She went to work as a bookkeeper in his office in 1927, and continued in that capacity as long as her husband lived and states that she became a partner in the business a long number of years before the written partnership agreement was executed. Her child was

born in 1925,—the half-sister to complainant. Some nine years after she had gone into the office of her husband, she obtained her license to practice law in 1935, having attended night law school. She says her law practice was largely confined to divorce cases, and matters involving small amounts. At the time that she entered her husband's office he had a branch office in Greenville, Mississippi, which was later discontinued. When she first went into the office there was a brother of her husband, Tom Young, whom she says left the business in 1930. She was taught how to keep the books, according to her statement, by H. H. Green, and her testimony indicates some kind of oral understanding; that she became a partner in the business at about the time Tom Young left the business. When she was asked about her work in the office with her husband, her answer was, ''Yes, sir, I went with him in the morning and I came home with him''. She details how it was that the complainant went to school and her efforts to help him in his education, along with the efforts of his father.

After Mrs. Young was admitted to the Bar she maintained her law office in the office of the partnership or company, and according to her statement her law practice averaged net about $600 or $700 annually.

She relates how it was that Dr. Young went to medical school, how he worked for the company during the vacations and layout periods, and that during the time he was in medical school he discussed with her his financial problems. She knew that his father had executed a will, witnessed by Mr. Green, whom she said taught her to keep the books, and a Mr. Gray, and by which the father of the complainant had a provision therein that complainant was to have the farm in question, the exact

words, "To my beloved son, John David Young, the farm", and her daughter was to have certain other property. She states that this will was kept in the safe, but that it could not be found after her husband's death. She also states that the partnership agreement, hereinafter mentioned, was in duplicate; that the original was kept in the safe, but it also disappeared and could not be found after the death of her husband.

As to her conversations with complainant during his medical education, these are some of her statements:

"A. Oh, yes, we used to have long discussions upon discussions about what all he was going to have. We were going to fill a closet with all the things that he could have when he got out and was practicing medicine."

She also states that about the last year in medical school, which she fixes as about 1939, she had a conversation with him after his father had put him off about the money he needed and she details that in the following manner:

"A. J. D. had put him off and put him off, and then he would come and talk to me about it. We were talking about it one day, and I said, 'Jimmy, we don't have the money. We are doing good to get by', and he told me what the other fellows had and what he would have, to have and I got sympathetic with him, and I finally said, 'Well, we will borrow it if you want to. If you want to do that, we will borrow it. J. D. has made a Will, willing the farm to you. We will borrow the money on the farm, and you can pay it back.'"

And the complainant remarked, "If I have to pay the money back, I do not want it."

She stated that the will she was talking about, which was never found, had a provision for certain stocks to go to her daughter and the rest of the estate to go to her. She further testified that her husband told her "That Olivia had willed it (speaking of the farm) to him under a heavy mortgage", and that there was some of the mortgage unpaid at the time of her marriage to him, but was paid in 1924.

She details how that she had visited the farm with this Mr. Young, who later came to be her husband, some two years before their marriage. She relates how it was that a small lake was built on the farm; that there was an old house and a barn on it when she first saw it and later another barn or new barn was built. Photographic evidences of this barn and this house, which she claims was repaired or rebuilt, are in the record and show that they were inexpensive improvements. She stated that she had complained about men working on the farm to a Mr. Reeves who had rented the farm, for a long number of years as hereinbefore shown. She details how it was that in making up financial statements, application for bonds and such, the involved property was scheduled as belonging to Mr. Young. Many of these documents are filed as exhibits and she admits that she usually filled them out herself. She discusses about the audit of the firm, known as the Ideal Heating Company and she was asked and answered:

"Q. That firm is known as what? A. The Ideal Heating Company.

"Q. Of which you are a partner; is that correct?
A. I was a very silent partner.

"Q. A silent partner? A. Yes, sir. All of the workmen, you see, were steamfitters. They would depend on me to tell them what to do. I didn't tell them what to do. I was there doing my job, but it had nothing to do with the operation."

She further stated that the income tax returns of the Ideal Heating Company were filed as "partnership returns".

Many of the questions asked her had to do with different reports made by the Ideal Heating Company showing the value of the farm, sometimes at $8,500 and sometimes at $20,560, all of these documents she said she wrote, or at least most of them, putting in figures as stated by her husband, and that many of the statements made in these papers were figures taken from former papers of a similar nature.

Much of this evidence seems to have been admitted by the Chancellor on the theory it might have some bearing on the renunciation of Young, Sr., of his curtesy interest in the farm in question. We are unable to see that it does.

We are unable to see much relevancy with respect to a great deal of her testimony. Mr. Young, her husband, had a severe heart attack in 1949 and was out of the office for several months. It is claimed by her that she made loans from her funds to him in an amount totalling $11,000, and that these deeds by which the farm in question was conveyed to her mother and then back to herself and her husband as tenants by the entirety on June 9, 1951, was in consideration for her surrender of the notes

evidencing money that her husband had borrowed from her. At the time that Mr. Young married Mrs. Young he owned a piece of property, where he then lived, and where the mother of complainant died, according to the death certificate, at 2155 Harbert Avenue in the City of Memphis, and Mrs. Young testifies that he gave her that piece of property soon after their marriage. It is singular, however, that the deed to the Harbert Street property was acknowledged the same day that the above referred to deeds were acknowledged, and it is further singular why that a partnership, which she contends that existed so long, was not reduced to writing until in January, 1951, and that it too was acknowledged on the same day that these referred to deeds to the farm and the Harbert Street property were acknowledged. Her testimony, in an effort to establish the loans made, are evidenced by certain exhibited documents. She claims that there were three notes aggregating the $11,000, two of which were for $3,000 each and one for $5,000, and in an effort to establish this borrow-relationship, the only note that she was able to produce was a $3,000 note dated June 14, 1950, and she contends that the other notes are lost, but that the loans which she claims to have made are shown by certain duplicate deposits which will be hereinafter referred to. Her statement about the acknowledgment of the deeds and the partnership agreement was in response to a question relative to a date she claims he gave her the Harbert Street property, when she answered the following question:

"Q. When did he sign a deed to it? A. I believe it was—I think it was when the deed to the farm was —when the deed to the farm and the deed to the Harbert property were notarized. I think that was

on the same day. He had the deed and we had to get a notary public. I think those were notarized on the same day. I had to get the notary public.''

She states how it was she had collected the rent from the Harbert Street property, and that she managed her mother's financial affairs, who died at the age of 87, and with respect to this money that she claims that she loaned him, she was asked and answered:

''Q. Did he ever tell you why he ever needed any of this money? A. Heavens no.''

She also admitted that she had a piece of property, deed taken in her own name, for which was paid $7,500 and of which $750 or $850 was paid in cash and the balance was paid as rent for the property from income of the Ideal Heating Company. She claims that she got this cash payment from her mother. This property was located on Madison Street. She was asked and answered:

''Q. After the building was paid for, was the partnership paying any more rent? A. No, sir, not one penny. That the agreement.

''Q. That was the agreement? A. That was the agreement.''

She contends that this partnership agreement was executed because her husband was afraid she would die and he would not get the property, though he awhile before had a severe heart attack. She was handed an instrument that she filed, which is a carbon copy of the alleged executed partnership agreement, and was asked and answered:

"Q. I will ask you how it came about that that was drawn? A. He asked me about it, what would happen if anything happened to me, if I should die, suddenly die. I told him that the property would probably go to Maude, and I told (him) that he didn't have to worry, that I didn't think he would have any trouble, and he said, 'I want something in writing'."

She admits that she wrote that instrument of partnership, but says he told her what to put in it. Being asked about the original, she said:

"* * * This copy was not the original, of course, it disappeared. * * * After he died, it was in his drawer, and after he died, I couldn't find it."

She stated that she had asked her husband several times to pay the money that he owed her and she made the statement that she would "needle" him about it. The partnership was in good financial condition at the time Mr. Young had the heart attack. It appears that this "needling" began after that heart attack and at a time when the son-in-law, she herself, and her daughter Maude were taking care of the business, and the proof shows both by her statement and by her son-in-law's statement that the combination to the safe was known by her, her husband and the son-in-law, and on cross-examination she was asked:

"Q. The phrase you used a minute ago 'needled'? A. I would 'needle' him, yes, sir."

She admitted also that the money she claims he borrowed was deposited to the partnership account. She was asked and answered:

"Q. But the money went into the partnership account? A. Yes, sir. That was only—to tell you the truth, the only account was his.

"Q. You had authority to draw checks on the partnership? A. Yes, I did."

She had testified that she knew her husband did not want to give up the farm. She was asked and answered:

"Q. You say that you knew J. D. did not want to give up this farm? A. He did not want to give anybody that farm. That farm was there, and he held onto it. Yes, *I knew he didn't want to give me the farm, and that is one reason that I thought the way to do it would be to put it in both of our names. I didn't want him to be severed from it completely.*" (Emphasis added.)

She was then asked about her statements on pretrial deposition wherein she had said:

"But I had devised a scheme whereby I was demanding payment.

\* \* \* \* \* \*

"The witness broke in at the point of the question and said: 'I was trying to tell him about it. I had decided that that was the only way I was going to get any of it.'"

Her testimony clearly shows that so far as the execution of instruments were concerned that she, between the first of January 1951 and June 9, when these documents were executed, she had acquired, by right of survivorship, everything that her husband owned, including this farm. So it was the interest in the Ideal Heating Company, the

real estate on Harbert Street, the farm, and she had already acquired the title to property on Madison. She contended that he offered her the absolute title to the farm and that she was the one who suggested the title be by entirety. She also testified that she knew that she was responsible for keeping the books of the partnership, and she was asked about taking charge of all the books, records, etc., whereupon she answered:

"A. * * * When I went to Mr. Hanover back in June of 1954, he told me to get those. Mr. Hanover was employed in June, 1954."

At that point Mr. Hanover interrupted saying, "You mean 1958, do you not?" The witness then answered, "Yes, sir, 1958", and when questioned further with respect to the showing on these deposit tickets which she claimed represented loans by her to her husband, she was asked and answered:

"Q. Did the money go into the partnership account? A. Well, it may eventually find itself into the partnership account. J. D. asked me for it, and I loaned it to him. What he did with it, I don't know."

This was a strange statement on the part of the bookkeeper who had charge of drawing checks and keeping the books of the Ideal Heating Company and with these duplicates of the deposit tickets showing as they do in this record, and particularly is this so since her Manhattan Branch of Union Planters National Bank & Trust Company savings account pass book which she has filed as Exhibit 15 to her testimony shows that she deposited to her own savings account 1943 to 1954, when Mr. Young died, over $13,000, which is the account she said she never

let him know she had. Mr. Young, during the same period of years, was building up his checking account in the same bank as shown by pass book which is her Exhibit 18, that had a balance when he died of $3,109.80, but not a single item of deposit on his pass book to his personal account corresponds with money she claims to have loaned him, but the dates she claims she made them on do correspond with like deposits to the Ideal Heating Company partnership account, which included hundreds of other items, and are evidenced by the Ideal Heating Company pass book in the same bank filed as her Exhibit 13-C, and by the duplicate deposit tickets filed as her Exhibits, during 1952 shows approximately 50 deposits totalling over $151,000.

Upon some of the deposit slips there are pencil notations which she says she made herself. Some places in her testimony she would say she made these loans in cash, at other times she would say she didn't remember. As an example of her statement in that regard she was asked:

"Q. Mrs. Young, do you know where you got the money for these? Did you get it out of the bank, or did you get it at home? A. No, I didn't get it out of the bank. I gave him the money.

"Q. You gave him the money? A. Yes, sir."

At that point she was shown her own savings account pass book which showed withdrawal of $3,500 on August 15, 1950, and she was asked:

"Q. Do you remember that? A. No sir.

"Q. I will ask you if you loaned him $3,500.00 on August 15th, on this deposit? A. Yes, sir, he talked me out of it."

On that deposit ticket there is written in pencil:

| | |
|---|---:|
| "Dodge | 1000.00 |
| | 300.00 |
| Aug. 14th | 300.00 |
| | 1600.00 |
| | 3500.00 |
| R. Y. | 5100.00" |

The above-quoted figures she admits made by her, and other statements carried on these deposit tickets also made by her.

Upon this type of calculation is where she claims she got the money represented by the notes which she testifies that she delivered at the time she got the deed from Mr. Young. The $3,000 note, however, that she does exhibit, she explains was found in the safe drawer and there is nothing on it to show that it was ever cancelled, or represented, at the death of Mr. Young, anything more than evidence of a loan. On cross-examination her attention was directed to the fact that this note was in her handwriting, that is, that part of it filled in with ink, and it is dated June 4, 1950, and written in the face, "3000.00 Dollars borrowed Aug. 1949". She had previously testified on direct examination that this date of 1949 was a mistake and that it represented money borrowed at some other time. Her attention was called to that fact and her answer was, "I said it very well could be." She was then asked:

"Q. In other words, your statements as to these deposit slips, as to the amount advanced did not coincide with August, 1949, did it? A. I would say

the note would correspond with it. The note was generally given when I would start pressing him for my money.

"Q. In 1950, that is your best reccollection as to when that note was given for money borrowed in August, 1949? A. Yes, sir."

Those statements in connection with the execution of that note and the date the money was borrowed, said to be represented by it, coincide about as completely as any other statement she made relative to amounts borrowed.

While the member of this Court that prepared this opinion has read every word in this entire record and has examined every exhibit, it seems to be a reasonable conclusion that when the Chancellor said he had allowed a broad latitude of inquiry from these witnesses, in his opinion, that certainly it was not an understatement of the latitude allowed, for it would appear that at least three-fourths of the evidence found in this record has nothing to do with either issue in the case, and the jury was evidently unimpressed with the witnesses who undertook to make this unimportant and irrelevant evidence fit into the issues to be considered by it.

Outside the fact that the will of Olivia B. Young was probated, and her husband reported that he was the only legatee and devisee, and executed the deeds by which they undertook to put the title in themselves as tenants by the entirety we are unable to see any act upon his part that ever informed the complainant, who was but a baby when that will was probated, that he had claimed title in fee. The letter written by the father to his son left to be opened after his death illuminates, not only the

intention of the father, but explains, in some measure, why he acted as he did with respect to the execution of the deeds and the partnership agreement.

There is no evidence whatever in this record which would justify the Trial Court or this Court in holding that the complainant ever had any sufficient constructive, —and certainly no direct notice, that his father intended to take and hold title to the involved real estate sufficient in law or in fact to defeat the remainder interest, and that the attempted conveyance by the step-mother and father puts either of them in the category of innocent purchaser.

Counsel for complainant in their brief have aptly stated that there are ten opinions of the Appellate Court in Tennessee which construed or discussed the Pretermitted Child Statute, and that in four of such cases a child was held to be disinherited by the provisions contained in the will or by unavoidable inferences which were to be drawn from the expressions of the will and the circumstances existing in the specific case. The first of such cases is Reeves v. Hagar, 101 Tenn. 712, 50 S. W. 760, 761, and is an opinion by Justice Wilkes. The main question was whether an innocent purchaser of the property involved, under the will in question and the facts of the case, had a superior title to that of afterborn child of the testatrix. Justice Wilkes said:

"As [a] preliminary, or collateral, to the main question, it is insisted that A. S. Reeves, Jr., having been born after the making of the will by the mother, and not being by it expressly disinherited, was only pretermitted in the will, and took a share in the testator's estate, to the same extent as if she had died in-

testate, and this share did not, therefore, pass to the husband, and could not pass to his assignee.''

He further said:

''We are of the opinion that the testatrix intended, by the provisions of her will, to disinherit her children, whether born or unborn, in favor of her husband, if he survived her, and to provide for all equally, if she survived him. There need not be an express clause of disinheritance, to bring the case without the operation of the statute, but it may result as an unavoidable inference. The will provided that the property, should go to the husband if he survived his wife; otherwise, to her bodily heirs. This necessarily means that, if the husband survives, he was to take the entire estate, to the exclusion of the child or children; if he did not, the children, born or unborn, were to take. In the event the husband took, the child was not pretermitted, but both those born and those unborn were excluded.''

It is very clear from the above quotation from that opinion that the will itself created the ''unavoidable inferences'' which the opinion mentioned.

The father and the afterborn children of that deceased mother were all living at the time of the institution of that suit. Justice Wilkes further said:

''Upon its face, the provisions of the will are entirely natural * * *.''

And further commenting, he said:

''The real question in the case is, whether the will of Mrs. Reeves, admitted to probate in common form,

and remaining unattacked from 1879 to 1893, will support a plea of innocent purchaser, in favor of a party who bought, in 1885, from the devisee under such will.''

It is very clear by that opinion that there was no relationship whatever between the family, that is, father and children and the purchaser, by blood or marriage. There were no circumstances of any kind or character which indicated that the purchaser was other than an absolute innocent purchaser, and having drawn that unavoidable inferences from the will, expressed in its terms to the effect that the children were disinherited thereby, of course, the innocent purchaser must succeed, with the facts of that case also supporting the conclusion.

The second such case was Fleming, Adm'x v. Phoenix Trust Company in 162 Tenn. 511, 39 S. W. (2d) 277. In the opinion prepared by Justice Cook, it expressly shows that the estate was insolvent and the part of the estate involved was proceeds of life insurance policies in which the beneficiary was the ''testator's estate''. The will directed:

'' 'that all of my debts shall be paid out of the proceeds of my life insurance policies.

'' 'All of the remainder of my property after payment of my debts I give to my wife, Eugene Algeo Fleming.' ''

In that case the testator had living a son age 15, a son age 11, both of whom were living at the time the will was executed and within eight months after the execution of the will another son was born, which birth occurred about eight years before the testator died. The Court said:

"The will cannot be read without perceiving that the dominant purpose of the testator was to subject the life insurance to payment of his debts and confer the remaining portion of his entire estate, real and personal, upon his widow, the mother of his children, to the exclusion of any child or children then living or afterwards born. *Without children living when the will was executed, it could not be implied that he had this class of dependents in mind.* But two children were then living. The claimant was born only a few months afterwards and nearly nine years before testator's death. We are not left to conjecture about the father's intention which was to confer the estate upon his wife to the exclusion of his children, subject to the rights of creditors, relying upon his wife's motherly care to provide for their children. The children were as effectively disinherited by the provisions of the will which passed the estate to the widow as if done by particular reference to each child.'' (Emphasis added.)

A clear distinction was made in the Fleming, Adm'x case with the opinion in Ensley v. Ensley, supra.

In King v. King, 166 Tenn. 115, 59 S. W. (2d) 510, the Court came to the conclusion that the will and the circumstances surrounding its execution, contention of the testatrix, relationship of the parties, and that at the time the will was executed she was an expectant mother,—having given birth to her only child within four months after the execution of the will, that she had only one full brother, and that the will expressly limited the estate of her husband, George C. Paschall, to that for life in the questioned lands, and with item two of said will containing the following provision:

"Item 2. I will and devise my lands, after the termination of the life estate given to my husband George C. Paschall to my brother W. E. King, if he is then living, and if he be dead, then said lands shall go to his children, share and share alike, the child or children of any deceased child to take the share the parent would have taken, if living."

The Supreme Court in that case said:

"The land in question represented Mrs. Paschall's interest in the estate of her deceased mother. The appellant, W. E. King, was her full brother, while the other heirs at law bore no relation to her mother. Her son, George C. Paschall, Jr., was born four months after she made her will, and his birth must have been expected by her at the date of her will. At that date Dr. Paschall was a man of large means, owning lands and personal property of a value in excess of $25,000, and had a lucrative medical practice, which was growing larger every year. At the date of Mrs. Paschall's death in 1918, he was worth probably $50,000 on the basis of existing values. These facts were known to Mrs. Paschall."

George C. Paschall found the will after the death of his wife, which occurred twelve years after the will was made, but he did not probate it or make any claim under it and notified W. E. King and his children that he would contest the will and that he claimed curtesy in the land. He used the land until his death in 1926, after which George C. Paschall, Jr., took possession of the land, occupied and used it until his death in May, 1929, without any interference from W. E. King, and the opinion said "* * * W. E. King, who, however, did not by any affirmative act relinquish or surrender any interest he

had in the lands * * *'' instituted this suit, had the will probated, and our Supreme Court in the opinion by Special Justice Garvin said:

"The court is of opinion that the preservation of her will by Mrs. Pachall for this long period, in connection with the facts aforesaid, leads unavoidably to the conclusion that she intended her land to go as provided in her will and thereby to disinherit her son."

In Marshall v. Marshall, supra, a husband made a will leaving all property to his wife two days before the final decree of adoption of a child who had been living with the testator and his wife for a year before that time. Two questions were presented in that case. One, whether or not adopted children came within the provisions of the Pretermitted Child Statute, and the other whether under the facts of the case that child was pretermitted. There were no other children involved, none having been born to either the adopted father or mother, and the fact that the adopted procedure was in process at the time the will was made, together with the other facts in the case and the provisions of the will, the Court arrived at the conclusion, and properly so, that the adopted parent had, by the will, disinherited the child then in process of adoption when the will was executed.

In Burns v. Allen, 93 Tenn. 149, 23 S. W. 111, 112, the will of John T. Eddins was before the Court. After a divorce had been granted the wife of the testator and by that decree certain real estate had been settled upon the divorced wife. The divorce was procured in October 1890. On December 4, 1890, John T. Eddins made and published the will in question, by which he devised all of his remaining property not settled on his divorced wife,

to his two sisters. A daughter, Mattie Eddins, was born March 1, 1891, after the father's death in the prior December. The child was held to be a pretermitted child under our statute, after an insistence by the other parties to the suit that the settlement on the mother was equivalent to a settlement on the child. Justice McAlister in the opinion said:

"Ordinarily the failure of a testator to make provision for a child in his will would be equivalent to a disinheritance of that child; the testator possessing the absolute power to make any disposition of his property by last will and testament, no matter how capricious or apparently unnatural. But under the express provisions of this statute we are of opinion that a posthumous child of the testator will succeed to the same portion of his estate as in case of intestacy, unless—First, the testator had in his lifetime provided for the child by settlement; or, second, the testator has made provision for the child in his will; or, third, unless there is an affirmative act of disinheritance of the child in the will itself. We think there was no error in the action of the Chancellor in excluding the evidence offered to show a parol disinheritance of the infant complainant, and that his construction of the statute was correct."

And the concluding paragraph of the opinion is as follows:

"The said Mattie Eddins not having been provided for in the lifetime of the testator, nor provided for in his will, nor disinherited in his will, the decree of the chancellor giving her the real estate in question must be affirmed."

That appears to be about the first case where our Supreme Court had determined the child to be pretermitted and applied the statute in behalf of the child.

In Ensley v. Ensley, supra, we have stated what our conclusions are with respect to the opinion of the Supreme Court in that case, which we think does not support the contention made by the defendant, but on the contrary supports the contention insisted upon by the complainant, both as to the question of an absolute pretermission of the complainant by the will of his mother and also that it cannot support the insistence of the defendant to the effect that the father and son were equal tenants in common in the property involved.

The case of Stephens v. Stephens, 28 Tenn. App. 58, 185 S. W. (2d) 915, 918, is an opinion by the Presiding Judge of this Court, the Honorable Luke McAmis. In that case the father had eight children by his first wife. He executed a will prior to his second marriage leaving his property to his eight children by his first marriage. He never changed the will, but married again and there were four children born by the second marriage. He died something like 19 years after the will was executed. The Pretermitted Child Statute was involved and this Court applied the involved statute, notwithstanding the fact that there had been a sale of the property and a lawsuit with respect to its proceeds. In that case the opinion discusses King v. King, Reeves v. Hager, Fleming, Adm'x v. Phoenix Trust Company, Marshall v. Marshall and Ensley v. Ensley, and concludes:

"How can we say with any assurance that the testator, if he ever thought of the will did not rely upon this statute (Pretermitted Child Statute) to equalize the distribution of his estate?"

After quoting the statute herein involved, the Court said: "It was to provide for just such a case as the one now before the court that this statute was passed." We think the case now under consideration is just such a case as calls for the application of the Pretermitted Child Statute.

Bowerman v. Burris, 138 Tenn. 220, 197 S. W. 490, consideration was given to the statute of pretermitted children, but this was a case being tried in the Circuit Court on an issue of devisavit vel non and the allegations were that the will was invalid because made,

"under a mistake and misapprehension of the facts; the same having been made at a time when the said David Bowerman believed that the defendant P. L. Bowerman, the only son of the said David Bowerman, was dead, and this mistake and misapprehension was such as renders the said paper writing void and of no effect as to this defendant."

That case, of course, was tried to a jury and the jury found in favor of the will. The Trial Judge had held incompetent certain oral statements which contestants proposed to prove. On appeal his action was sustained by the Court of Civil Appeals. The Supreme Court granted certiorari and sustained the Trial Court and the Court of Appeals. The Court said:

"We are not passing judgment on the motives behind the offer of the present evidence, nor are we impeaching the integrity of the witnesses in the case before us. Our view is based solely on the evil tendency of such evidence in general."

In commenting upon the position the Court took in that case which was tried in 1917, and the reference to the Pretermitted Child Statute being Thompson's-Shannon's Code 2925, 3936, the Court said:

"The only instance in which the pretermission of a child is held as ground of relief is in the case of an unborn child, and that depends upon the express terms of our statute, granting to such pretermitted child the same interest in the estate of his father as it would have taken in case of intestacy." (138 Tenn. at page 224, 197 S. W. at page 491) "* * * In states where there is no statute in favor of pretermitted children it is held, as we have held here, that the mistake must appear on the face of the will." (138 Tenn. at page 225, 197 S. W. at page 491).

In Frank v. Frank, 1936, 170 Tenn. 112, 92 S. W. (2d) 409, 410, by the testator's first marriage there were children provided for under a will executed a few months before his second marriage. In about 14 months after the second marriage a child was born to that marriage. The testator died a little less than three years after the birth of the child to the second marriage without having made another will. After the will was probated the widow dissented. The case was administered by the executor in Chancery Court. It was the insistence that the will had been revoked by virtue of this second marriage and the birth of a child. The widow having dissented from the will, of course, was in no position to make such question because she took under her rights as though no will had been executed and as to this last child born to the second wife the Court, after quoting the statute herein involved, said:

"The child of the second marriage therefore takes the same portion of his father's estate whether the will be revoked or not.

"Such being the situation, we think, upon the authorities cited, there is no revocation of the will. We find no precedent for adjudging a revocation where its only effect would be to displace an executor appointed by the will and to permit the estate to be wound up by an administrator appointed by the court."

In Couch v. Couch, 1951, 35 Tenn. App. 464, 248 S. W. (2d) 327, 335, apparently the last case in our State in which this Pretermitted Child Statute is discussed at all, the question there was whether attempted adoption by contract with no judgment of the court whatever, created a parent-child relationship so as to bring into play this Pretermitted Child Statute and the Court had this to say:

"Our conclusion is that only a legally adopted child is entitled to the benefit of Code Section 8131; that a legal adoption can be accomplished only by a proceeding in substantial compliance with the adoption statutes; that therefore the attempted adoption by contract in the present case was ineffectual and hence the complainant is not entitled to the rights of a pretermitted child."

That contract was intended to confer upon this child the right of inheritance as if it were a natural legitimate child, and the other question in the case was whether or not that this contract created estoppel on the part of the testator so as to preclude disposition of his estate by will, and, of course, the Supreme Court held that the Chancellor properly dismissed the bill.

So it would seem by the last three above referred to cases that the direct question that we have may have been dealt with by dictum only, but we think that the quotations therefrom are sufficient to shed some light upon the application of our Pretermitted Child Statute, and more particularly as it relates to an unborn child with no children living when the will was executed, nor with a child in gestation.

This brings us now to the application of the opinion of the Supreme Court in the case of Edwards v. Puckett, supra, to the situation involved here, more particularly as it relates to the defenses set up by the pleas of the statute of limitations, both 7 and 20 years. In that case the Court discussing the relationship between a life tenant and a remainderman as it relates to the doctrines of "ouster" so that by a claim of adverse possession the life tenant might claim title in fee, makes direct reference to such doctrine between tenants in common and said:

"But the rule has no application as between a life tenant and remaindermen." [196 Tenn. 560, 268 S. W. (2d) 586.]

Further discussing this relationship, the Court fixed a rule by which such relationship must be governed, saying:

"We think it is a settled rule of law in this State that, 'Every owner of a life estate is a quasi trustee for the remainderman, and can legally do nothing to the prejudice or destruction of his interest.' See many cases cited in Vol. 10, Encyclopedic Digest of Tennessee Reports pp. 756, 757."

It is true that in Edwards v. Puckett the decree of the Chancellor vested the life estate in Puckett's mother and

the remainder in fee to the child, W. J. Edwards, who was then an infant, but we see no distinction in the relationship of the mother and her infant child in Edwards v. Puckett, and that of Young, Sr. and the infant child, complainant here, on the death of the child's mother. It seems to us that the Pretermitted Child Statute fixed the relationship of the father and his infant son, as relates to the title of the involved property, to the same degree that the decree in Edwards v. Puckett fixed their property relationship. One, by decree, the other by statutory law.

Furthermore the Edwards case was filed 25 years after the involved child became 21 years of age. The real estate had been sold under a deed of trust executed by both the mother and father and purchased by the mother and the stepfather. Later it was conveyed several times by warranty deeds, and the last purchaser was in possession. They plead the statute of limitations, just as has been done in the instant case. The Court of Appeals expressly held that the mother and stepfather did not and could not hold adversely to the Edwards child who at that time was about a half century of age, and Judge Neil in the published opinion of the Supreme Court in that case emphasized the holding of the Court of Appeals, adopting and approving the rule as follows:

" 'A life tenant may be a purchaser at a sale to satisfy an encumbrance; but neither a life tenant nor one claiming under him, who allows the property to be sold for taxes or the satisfaction of an encumbrance, or the interest thereon, can acquire a title adverse to the remainderman or reversioner by purchasing at the sale himself, *or through an intermediary, or by obtaining a conveyance of the title acquired by another purchaser at such sale.* Such a

transaction amounts simply to a payment or redemption.' 31 C. J. S. Estates, sec. 35, p. 44. (Emphasis added.)

"We think the foregoing is unquestionably the rule of law in Tennessee. It finds support in Miller v. Gratz, 3 Tenn. App. 498, McGee v. Carter, 31 Tenn. App. 141, 148, 212 S. W. (2d) 902."

Furthermore in Edwards v. Puckett the Court dealt strictly with these persons who claimed to hold title as innocent purchasers from the mother and stepfather. If indeed a life tenant undertakes to hold adversely to the remainderman so as to perfect title in himself, as said in Edwards v. Puckett case,

" 'The life tenant or his conveyee must not only disclose to the remaindermen the basis of his claim, Superior Oil Corp. v. Alcorn, 242 Ky. 814, 47 S. W. (2d) 973, but there must be some clear and positive overt act or express notice, Trimble v. Gordon, 270 Ky. 476, 109 S. W. (2d) 1217, 1219, to start the running of the statute.'

"The authority which the Court of Appeals cites, Superior Oil Corp. v. Alcorn, supra, in support of its holding that 'title and possession of a life tenant does not become adverse as to the remaindermen unless the life estate is renounced' is fully explained in the Kentucky Court of Appeals' Opinion, as follows: that the life tenant acquires some color of title incompatible with the existence of a life estate and a remainder estate. It is then and only then and when the remainderman knows of such entry and holding and possession that the remainderman's cause of action accrues. The Kentucky court further holds that

an *attempted conveyance of the fee by a tenant by the curtesy is not sufficient to start the running of the statute.* (Emphasis added.)

"It thus appears from the foregoing statement as to what constitutes the renunciation of a life estate that the holding in Quarles v. Arthur (our case, 33 Tenn. App. 291, 231 S. W. (2d) 589) does not control the case at bar."

If the subsequent purchasers from the former Mrs. Edwards and her second husband Puckett, by warranty deeds to innocent purchasers who had held recorded title for many years, could not start the statute of limitations to operate when the child in that case became 21 years of age, certainly where our statute provides that a pretermitted child takes as though the parent died intestate, and there is but one child involved, he being such pretermitted child, the deeds executed by his father and his stepmother to her mother and back to them as tenants by the entireties, could not furnish any authority whatever for the beginning of the operation of the statute of limitations of adverse possession in the instant case.

We think, as hereinbefore stated, there is abundant proof in this record to support the verdict of the jury on Issues I, III and IV, and not only is there some evidence to support such a verdict, but that a great preponderance of the evidence supports that verdict on those three issues. The Chancellor has approved that verdict and we are thoroughly satisfied that such action was correct. We are further confident that the evidence on behalf of the defendants preponderates against defendant's contention and in and of itself furnishes proof to support the verdict of the jury. In addition it is greatly fortified by the proof offered in behalf of complainant.

Furthermore, we think the Chancellor was eminently correct in his analyses of why the jury answered Issue No. II submitted to it in the affirmative, and in disapproving that affirmative answer. We think our reasons hereinbefore set out fully sustain our position in that regard.

We have carefully read the Assignments of Error as relates to Special Requests offered by defendant for submission of issues to the jury, and the requests for special instruction. We are satisfied that the issues submitted and the charge of the Court to the jury are ample in every respect.

Without discussing these special requested issues, special instructions and the motion for directed verdict further, all Assignments of Error are overruled, the judgment and decree of the Chancery Court of Shelby County affirmed, and the defendant below, appellant in this Court and the sureties on her cost bond will be taxed with all the costs incident to the appeal and in this Court.

The cause is remanded to the Chancery Court of Shelby County for further consideration of the other questions involved, not inconsistent with this opinion, and all the costs in the lower Court will abide the final judgment and decree of that Court. Decree will enter in this Court in accord with this opinion.

Judge Bejach, one of the Judges of this section of the Court recused himself because of knowledge he had of the matters involved and Judge Robert E. Cooper of the Eastern Division sat in his place and stead with the other two Judges of this Section in the trial of this cause.

Carney and Cooper, JJ., concur.